NO. 25-2505

# United States Court of Appeals for the Ninth Circuit

UNIVERSAL-INVESTMENT-GESELLSCHAFT, MBH; UNIVERSAL-INVESTMENT-LUXEMBOURG, SA; MENORA MIVTACHIM INSURANCE LTD.; MENORA MIVTACHIM PENSIONS AND GEMEL LTD.; THE PHOENIX INSURANCE COMPANY; THE PHOENIX PROVIDENT PENSION FUND LTD.; ASBESTOS WORKERS PHILADELPHIA WELFARE AND PENSION FUND; DETECTIVES ENDOWMENT ASSOCIATION ANNUITY FUND,

*Plaintiffs-Appellants,*

– and –

SONNY JOYCE, JERRY HANNAH,

*Plaintiffs.*

– v. –

AMAZON.COM, INC.; ANDREW R. JASSY; JEFFREY P. BEZOS; BRIAN T. OLSAVSKY; DAVID A. ZAPOLSKY; NATE SUTTON; DAVID FILDES; DAVE CLARK; DOUG HERRINGTON; JEFF WILKE,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

<table>
<tr><td>

JEREMY A. LIEBERMAN
EMMA GILMORE
VILLI SHTEYN
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

ROGER M. TOWNSEND
TOWNSEND LEGAL
380 Winslow Way, Suite 200
Bainbridge Island, Washington 98110
(206) 761-2480

</td><td>

GREGG S. LEVIN
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
SUSAN RANEE SAUNDERS
ERIN C. WILLIAMS
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000

JAMES A. HARROD
TIMOTHY FLEMING
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

</td></tr>
</table>

*Attorneys for Plaintiffs-Appellants*



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................1

ARGUMENT ....................................................................................2

I.    Plaintiffs Adequately Alleged Scienter Concerning the Third-Party
Seller Allegations..........................................................................2

    A.    Plaintiffs Sufficiently Pled Bezos's Scienter ........................2

    B.    Plaintiffs Sufficiently Pled Wilke's Scienter ........................4

    C.    Plaintiffs Sufficiently Pled Herrington's Scienter ................9

    D.    Defendants' Spoliation and Other Averments Further
Contribute to a Strong Inference of Scienter.......................10

II.    Plaintiffs Adequately Alleged Scienter Concerning Defendants' False
and Misleading Statements About Amazon's Capacity Expansion .............11

    A.    Defendants' "Warnings" Do Not Negate Scienter............12

    B.    Defendants' Specific, Repeated Statements Support Scienter...........13

    C.    The Former Employee Accounts Support Scienter............16

    D.    Temporal Proximity Supports Scienter ................................17

    E.    Jassy's Management Style Supports Scienter .....................18

    F.    The Core Operations Doctrine Supports Scienter..............20

    G.    A Holistic Review Supports Scienter..................................21

III.    Defendants Failed To Rebut Plaintiffs' Showing Of Motive.......................22

    A.    The Compensation Allegations Support Scienter ...............23

    B.    Defendants' Suspicious Stock Sales Support A Scienter Finding......26

IV.    Defendants' Loss Causation Challenge Should Be Rejected.......................29

CONCLUSION ..............................................................................31

WORD COUNT FORM

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Berson v. Applied Signal Technology, Inc.*,
  527 F.3d 982 (9th Cir. 2008)...............................................................10

*City of Warren General Employees' Retirement System v.*
  *Teleperformance SE*,
  2024 WL 2320209 (S.D. Fla. May 22, 2024) ....................................7, 11

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F.Supp.3d 580 (N.D. Cal. 2019) ........................................... 23, 31

*Fouad v. Isilon Systems, Inc.*,
  2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ................................28

*Garbaccio v. Starbucks Corp.*,
  2025 WL 3228275 (W.D. Wash. Nov. 19, 2025)................................19

*Gimpel v. The Hain Celestial Group, Inc.*,
  156 F.4th 121 (2d Cir. 2025)...............................................................23

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*,
  63 F.4th 747 (9th Cir. 2023) ............................................................5, 6

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001) ............................................................26

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)............................................................................12

*Holmes v. Baker*,
  166 F.Supp.2d 1362 (S.D. Fla. 2001) .................................................29

*In re Alphabet, Inc. Securities Litigation*,
  1 F.4th 687 (9th Cir. 2021) ......................................................... 21, 26

*In re American Apparel, Inc. Shareholder Litigation*,
  2013 WL 174119 (C.D. Cal. Jan. 16, 2013) .......................................11

*In re Avon Securities Litigation*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................................16

*In re Daou Systems, Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ....................................... 16, 26, 27, 29

*In re Fastly, Inc. Securities Litigation*,
  2025 WL 2721693 (N.D. Cal. Sept. 24, 2025) ...................................22

*In re Golden Heaven Group Holdings Ltd. Securities Litigation*,
   2025 WL 714171 (C.D. Cal. Mar. 3, 2025) ............................................................6

*In re Intuitive Surgical Securities Litigation*,
   65 F.Supp.3d 821 (N.D. Cal. 2014) ..................................................................27

*In re Mylan N.V. Securities Litigation*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023) ....................................................18

*In re New Century*,
   588 F.Supp.2d 1206 (C.D. Cal. 2008) ..............................................................16

*In re Origin Materials, Inc. Securities Litigation*,
   766 F.Supp.3d 998 (E.D. Cal. 2025) ................................................................21

*In re Quality Systems, Inc. Securities Litigation*,
   865 F.3d 1130 (9th Cir. 2017) ............................................................... 19, 27

*In re QuantumScape Securities Class Action Litigation*,
   580 F.Supp.3d 714 (N.D. Cal. 2022) ................................................................16

*In re Read-Rite Corp. Securities Litigation*,
   335 F.3d 843 (9th Cir. 2003) ............................................................................8

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   2010 WL 8816155 (N.D. Cal. Aug. 14, 2010) ..................................................24

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
   697 F.3d 869 (9th Cir. 2012) ...........................................................................24

*In re Romeo Power Inc. Securities Litigation*,
   2022 WL 1806303 (S.D.N.Y. June 2, 2022) ....................................................28

*In re Syncor International Corp. Securities Litigation*,
   239 F.App'x 318 (9th Cir. 2007) ........................................................................3

*In re Turquoise Hill Resources Ltd. Securities Litigation*,
   625 F.Supp.3d 164 (S.D.N.Y. 2022) ................................................................18

*In re U.S. Aggregates, Inc.*,
   235 F.Supp.2d 1063 (N.D. Cal. 2002) ..............................................................4

*In re VeriFone Holdings, Inc. Securities Litigation*,
   704 F.3d 694 (9th Cir. 2012) ...........................................................................21

*In re Virtu Financial, Inc. Securities Litigation*,
   770 F.Supp.3d 482 (E.D.N.Y. 2025) ................................................................15

*In re Worlds of Wonder Securities Litigation*,
   35 F.3d 1407 (9th Cir. 1994) ............................................................................13

*Indiana Public Retirement System v. Rivian Automotive, Inc.*,
  2025 WL 2426714 (C.D. Cal. Aug. 20, 2025) ..................................................23

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ............................................................................1, 15

*Johnson v. Knapp*,
  2009 WL 764521 (C.D. Cal. Mar. 16, 2009) ......................................................29

*Levon v. CorMedix Inc.*,
  2025 WL 2400346 (D.N.J. Aug. 19, 2025) ........................................................19

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...........................................................................30

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .............................................................................29

*Mulderrig v. Amyris, Inc.*,
  492 F.Supp.3d 999 (N.D. Cal. 2020) .................................................................27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ...........................................................................28

*Ohio Public Employees Retirement System v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) .....................................................2

*Oklahoma Firefighters Pension & Retirement System v. Six Flags
  Entertainment Corp.*,
  58 F.4th 195 (5th Cir. 2023) ..............................................................................17

*Oklahoma Firefighters Pension & Retirement System v. Snap Inc.*,
  2024 WL 5182634 (9th Cir. Dec. 20, 2024) ......................................................20

*Petrie v. Electronic Game Card, Inc.*,
  761 F.3d 959 (9th Cir. 2014) .............................................................................22

*Prodanova v. H.C. Wainwright & Co.*,
  993 F.3d 1097 (9th Cir. 2021) .............................................................................5

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .................................................................... 7, 8, 15

*Retail Wholesale Department Store Union Local 338 Retirement Fund
  v. Stitch Fix, Inc.*,
  790 F.Supp.3d 763 (N.D. Cal. 2025) .................................................................18

*Robb v. Fitbit Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ......................................................11

iv

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ............................................................30

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .................................................................................5

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018) ..........................................................17

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F.Supp.3d 300 (S.D.N.Y. 2024) ...................................................................25

*SEB Investment Management AB v. Endo Int'l, plc*,
351 F.Supp.3d 874 (E.D. Pa. 2018) .....................................................................14

*Shenwick v. Twitter, Inc.*,
282 F.Supp.3d 1115 (N.D. Cal. 2017) ................................................................14

*Sneed v. Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025) ........................................................................3, 21

*South Ferry LP, # 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ......................................................................... 10, 20

*Sylebra Capital Partners Master Fund Ltd. v. Everbridge, Inc.*,
2025 WL 1938359 (9th Cir. July 15, 2025) .........................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .............................................................................................12

*United Ass'n National Pension Fund v. Carvana Co.*,
759 F.Supp.3d 926 (D. Ariz. 2024) .......................................................... 7, 15, 16

*United States v. Triumph Capital Group*,
544 F.3d 149 (2d Cir. 2008) ................................................................................10

*Washtenaw County Employees Retirement System v. Celera Corp.*,
2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ......................................................17

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) .................................................................................4

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
2025 WL 2097951 (S.D.N.Y. July 25, 2025) ......................................................21

*Zelman v. JDS Uniphase Corp.*,
376 F.Supp.2d 956 (N.D. Cal. 2005) ....................................................................4

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...............................................................................24

## INTRODUCTION

Plaintiffs' opening brief explained why the SAC presented actionable claims warranting reversal of the District Court's dismissal.[1] Defendants' response ignores the principles governing Rule 12(b)(6) motions: courts must accept the allegations as true and draw reasonable inferences favorable to plaintiffs. While paying lip service to the scienter balancing test, where equally compelling inferences must be weighed *in favor* of scienter, Defendants commit the same error as the court below— they seek inferences that cannot be drawn from the SAC. Defendants also give short shrift to numerous principles that courts regularly rely upon to assess whether a plaintiff's pleading is adequate—among them that the "content and context" of a defendant's own words constitute "the most powerful evidence of scienter." *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). Applying those principles, Plaintiffs sufficiently pled scienter and the District Court's Judgment should be reversed.

Additionally, Defendants' contention that the announcement of a governmental subpoena cannot support loss causation should be rejected. Unlike in Defendants' authority, loss causation here is *not* premised solely on a government

---

[1]    Capitalized terms not otherwise defined shall have the same meaning as in the Opening Brief of Plaintiffs-Appellants ("Pls.Br.__"). Citations to the Brief of Appellees are cited herein as "Opp'n.__."

investigation. Rather, the disclosure of the SEC subpoena was part of several interconnected partial disclosures.

## ARGUMENT

## I. Plaintiffs Adequately Alleged Scienter Concerning the Third-Party Seller Allegations

### A. Plaintiffs Sufficiently Pled Bezos's Scienter

Defendants make no reference to the holding in *Ohio Public Employees Retirement System v. Meta Platforms, Inc.* that an "inference of scienter" is raised when, as here, the defendant-executive "had hands-on involvement in the decision-making process." 2024 WL 4353049, at *15 (N.D. Cal. Sept. 30, 2024). That omission is glaring given that Bezos orchestrated a "defect" advertising campaign Amazon employed throughout the Class Period designed to extract outsized profits at the expense of third-party sellers. This program replaced relevant search results with irrelevant ads, and each consumer click on an irrelevant ad generated a fee that a third-party seller had to pay Amazon without converting the ad into an actual sale. That Bezos directed this practice stood in stark contrast to his Class Period statement that Amazon "***support[ed]*** millions of small businesses [third-party sellers] who sell through Amazon." 3-ER-294(¶440).[2]

---

[2] Defendants argue that "the advertising policy would be neutral to third-party sellers, who would not themselves pay any extra cost" (Opp'n.52), but they confuse the issue. The extra cost related *not* to the third-party seller's obligation to pay per consumer click, but to the fact that the defects ad campaign drove shoppers to more expensive products sold directly by Amazon. 3-ER-220(¶213). Those products

Defendants invoke the District Court's observation that Bezos's statements were not directly "related to advertisements or search results" (Opp'n.52), but the law does not require such a precise match. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 F.App'x 318, 320 (9th Cir. 2007) ("By attributing Syncor's success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."). By claiming that Amazon was "supporting" third-party sellers, Defendants "implicitly (and falsely) warranted" that Amazon was not engaging in improper practices that hurt them. Indeed, the District Court understood this point when it found that Defendants' representations that "Amazon was 'committed' 'to supporting' third-party sellers" were false because "Defendants in fact employed anticompetitive tactics against third-party sellers." 1-ER-55. *A fortiori*, Bezos's knowledge of these practices, i.e., *vis-à-vis* the "defects" ad implementation he ordered, is adequately linked to his false statements.[3]

---

were naturally ones that a consumer would have purchased and have nothing to do with a pay per click that failed to result in a sale. In any event, an unnamed Amazon executive's speculation that the "extra cost is likely to be passed down to the customer" (3-ER-220(¶214)) is irrelevant to Bezos' scienter.

[3]     *Sneed v. Talphera, Inc.* (Opp'n.53)—involving a "snappy slogan" used in connection with marketing a drug—is readily distinguishable because plaintiffs failed to plead falsity and defendants "simultaneously disclos[ed]" the information that plaintiffs claimed was concealed. 147 F.4th 1123, 1127, 1134-35 (9th Cir. 2025). Here, Bezos's statements were not "snappy slogans" but representations the District Court held were false and misleading.

That Bezos directed the implementation of the "defects" ad campaign starting in 2016 does not negate the fact that his Class Period statements were made with scienter. *See Zelman v. JDS Uniphase Corp.*, 376 F.Supp.2d 956, 971 (N.D. Cal. 2005) ("[F]acts relevant to scienter will ordinarily date from before any alleged misrepresentations."); *In re U.S. Aggregates, Inc.*, 235 F.Supp.2d 1063, 1065 n.1 (N.D. Cal. 2002) ("The allegations detailing Defendants' pre-class period conduct are material to Plaintiff's contention that Defendants[] knew the statements during the class period were false."). Indeed, while Defendants refer to this as "outdated information," they concede such data "may be 'relevant' to the scienter inquiry." Opp'n.53.[4]

## B.    Plaintiffs Sufficiently Pled Wilke's Scienter

Scienter is also adequately pled as to Wilke, who developed a first-party anti-discounting algorithm employed during the Class Period that immediately copied the lower prices third-party sellers offered outside Amazon, depriving the sellers of their ability to gain scale from lower-priced offerings, and punished sellers who

---

[4]    The SAC does not allege that the "defects" ad campaign was altered after its implementation so that Bezos was no longer aware of its mechanics. And far from holding that pre-class period information can never demonstrate scienter (Opp'n.53), *Webb v. Solarcity Corp.* emphasizes that such information can "*confirm* what a defendant should have known during the class period." 884 F.3d 844, 851 n.1 (9th Cir. 2018) (emphasis added). Moreover, *Webb* did not involve allegations that a defendant personally directed a pre-class period practice that continued during the class period.

offered lower prices outside the Marketplace. 3-ER-203-05(¶¶172-76) (providing examples of how Wilke's algorithm worked in practice). Additionally, Wilke designed the "tit-for-tat" pricing strategy aimed to ensure third-party sellers *raised* their prices on Amazon's Marketplace if higher prices appeared elsewhere, "to increase your chances of becoming the Featured Offer." 3-ER-210(¶188). It is implausible to suggest that Wilke was not privy to information related to those issues.

While Defendants argue that Plaintiffs did not plead Wilke's intent to deceive Amazon's shareholders (Opp'n.60), if Wilke knew that Amazon engaged in practices that *hurt* third-party sellers when he publicly represented that Amazon was "*supporting*" them, his scienter is sufficiently pled. *Ronconi v. Larkin* does not compel a different result. There, the Court found the alleged misrepresentations were not misleading. 253 F.3d 423, 432 (9th Cir. 2001) ("We cannot discern what statements the complaint says were false or misleading."). Moreover, the Court's analysis was "abrogated by subsequent Supreme Court decisions that treated falsity and scienter as separate requirements." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

*Prodanova v. H.C. Wainwright & Co.* helps Plaintiffs because it recognizes that "*direct[] involve[ment]*" in the alleged misconduct provides "enough factual support for a plausible inference of scienter." 993 F.3d 1097, 1110 (9th Cir. 2021).

5

Here, Plaintiffs detailed Wilke's direct involvement in the first-party algorithms and the tit-for-tat strategy. *See Glazer*, 63 F.4th at 772 ("participat[ion] in the alleged … campaign" raised "strong inference" of scienter).

Plaintiffs likewise sufficiently pled Wilke's scienter for the data-related statements. The District Court held that Plaintiffs "sufficiently ple[d] widespread violations of Amazon's internal policy [during the Class Period], and thus misleading Data Statements." 1-ER-53. The SAC alleges that a bipartisan Congressional probe concluded that Amazon routinely misappropriated third-party seller data for use in its private label products (3-ER-161-62(¶70)), and that the European Commission found that "very granular, real-time business data relating to third-party sellers' listings and transactions on the Amazon platform systematically feed into the algorithm of Amazon's retail business" (3-ER-172(¶94)). During this period, Wilke made unequivocal statements to the contrary—representing that "[w]e don't use any data about specific items that's not available to the world by just looking at—at our website" and "[w]e do not look at individual seller data when we decide what products to launch in private label." 3-ER-283(¶408), 3-ER-305(¶480). This "broad chasm" between words and deeds strongly supports an inference of scienter. *See In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171, at *5 (C.D. Cal. Mar. 3, 2025).

6

Moreover, an internal 2015 audit report showed that Wilke was personally aware that thousands of Amazon employees had obtained unauthorized access to proprietary third-party seller data. 3-ER-175-76(¶¶104-05). Defendants assert that Amazon employs over 1.6 million individuals (Opp'n.54), but ignore that the 4,700 employees with access to the third-party sellers' data *worked on Amazon's private label*, so Wilke was aware of the heightened risk that these employees would use the data to inform private label decisions.

The significance of Wilke's *repeated* and *authoritative* statements that Amazon did not look at third-party seller's data to benefit private label should not be overlooked. *See City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 2024 WL 2320209, at *19 (S.D. Fla. May 22, 2024) ("[R]epetition of misstatements supports a finding of scienter."); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (scienter pled given "detailed factual statement[s], contradicting important data to which []he had access"). If Wilke had sought to confirm the veracity of his statements, he would have learned (as regulators did) of the widespread violations and routine misappropriations of third-party seller data. If, on the other hand, he did not investigate, his representations were actionably reckless. *See, e.g.*, *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F.Supp.3d 926, 974 (D. Ariz. 2024)

("[R]eassur[ing] investors ... *without* actual knowledge … evince[s] deliberate recklessness.").[5]

While Defendants contend that Amazon "investigate[d] and found *no policy violations*" (Opp'n.56 (emphasis added)), Plaintiffs allege that the investigation—of which Wilke was aware (3-ER-305(¶480))—was a whitewash, as it focused on the alleged misuse of *two products* by a *single employee* (3-ER-167-68(¶82)). Comprehensive investigations conducted by governmental bodies reached the opposite conclusion—and Plaintiffs' averments regarding same must be accepted as true.[6]

---

[5] Plaintiffs allege that employees working on private label *did* access the third-party data and used it routinely to inform private label decisions. 3-ER-161-62(¶70). Defendants cite *In re Read-Rite Corp. Securities Litigation*, 335 F.3d 843 (9th Cir. 2003)—which has been abrogated—to argue that the 2015 audit report is "too stale" to indicate Wilke's contemporaneous knowledge. Opp'n.55. But *Read-Rite* did not hold that pre- or post-class period information cannot establish such knowledge. Instead, on the facts before it, this Court found that "post-class-period admissions *that are neither inconsistent with nor directly contradictory to the allegedly fraudulent statement[s]*" are insufficient to show contemporaneous knowledge. 335 F.3d at 848 n.1 (emphasis added). Here, Plaintiffs allege pre-Class Period information within Wilke's knowledge that was inconsistent with his misleading statements.

[6] Defendants' attempt to distinguish *Reese* falls flat. While Defendants posit that Plaintiffs did not identify a "direct contradiction between Wilke's statements and his internal knowledge" (Opp'n.57), that is precisely what Plaintiffs have alleged. At the time Wilke made his statements, *see, e.g.*, 3-ER-146-47(¶7), 170-71(¶90), 283(¶408), the question of whether Amazon was using third-party sellers' data for its own benefit was "the focus of both public and government inquiries." *Reese*, 747 F.3d at 571. "In the wake of [this] crisis," Wilke "had every reason to review" and investigate reports beyond that made by one single employee. *Id.* Had

### C. Plaintiffs Sufficiently Pled Herrington's Scienter

Using its vast surveillance network, Amazon systematically punished third-party sellers when it detected lower prices outside Amazon's Marketplace. 3-ER-197(¶154). Company documents reflect that Herrington was aware of this practice and commented that policing sellers to prevent them from discounting outside Amazon is "a dirty job, *but we need to do it*." 3-ER-197(¶155). Internally, Herrington was credited with the development of Amazon's Standards for Brands ("ASB"), which required third-party sellers to ensure they offered products outside Amazon's Marketplace at prices as high or higher than those they offered on Amazon's Marketplace. 3-ER-199(¶163), 3-ER-200(¶165), 3-ER-201(¶167). Accordingly, Defendants' argument that Plaintiffs do not plead facts supporting that Herrington was personally involved in ASB, "learned this program would prevent third-party sellers from discounting on other platforms," *or* "knew" particular "information" about it (Opp'n.61) fails.

Defendants further claim that a "temporal disconnect" between ASB's development and Herrington's subsequent misstatement negates his scienter.

---

he undertaken a more extensive inquiry, Amazon's widespread misappropriation of third-party data (a fact laid bare by the non-biased, third-party investigations based on Amazon's own documents) would have been readily apparent. 3-ER-147(¶8), 165-66(¶77), 171(¶92).

Opp'n.61. Not so. His knowledge of this practice, which continued during the Class Period, had not dissipated by the time of his alleged misrepresentation.[7]

### D. Defendants' Spoliation and Other Averments Further Contribute to a Strong Inference of Scienter

Bezos, Wilke, and Herrington intentionally destroyed information relevant to the FTC investigation. *See* Pls.Br.39; *see also United States v. Triumph Cap. Grp.*, 544 F.3d 149, 160 (2d Cir. 2008) ("[E]fforts to obstruct the investigation evidence a consciousness of guilt."). While Defendants assert that Plaintiffs do not allege the deleted information related to third-party-seller allegations (Opp'n.62), they ignore allegations explaining that the FTC investigation and lawsuit focus on the same anti-competitive practices that are at the crux of Plaintiffs' claims. 3-ER-196-97(¶¶153-55), 3-ER-201(¶167), 3-ER-203-04(¶¶172-73), 3-ER-218(¶209), 3-ER-345(¶¶596-97). Accordingly, Defendants' spoliation is relevant.

Moreover, this spoliation is pled alongside several other categories of circumstantial evidence that support scienter when viewed through a common-sense perspective.[8] For example, Defendants cannot escape the import of numerous

---

[7] *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 989 (9th Cir. 2008), which requires only knowledge the statement was false *when made*, is not to the contrary. Opp'n.61. Here, Herrington had been aware of the practice since its inception.

[8] The parties agree that common sense is important when evaluating scienter. *See S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (under *Tellabs*' "holistic" approach, "federal courts … need not close their eyes to circumstances

regulatory investigations (and related findings). *See Teleperformance*, 2024 WL 2320209, at *20 ("[T]he existence of the Colombian government's investigation ... further bolsters the inference of scienter."). Nor can they disregard Wilke's direct subordinate's knowledge. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *21 (C.D. Cal. Jan. 16, 2013) ("[Those] who had access to information concerning these problems worked only one or two levels below [Defendants], supporting an inference that the information was communicated to them at some point in time."). These facts, viewed holistically and in combination with Plaintiffs' other averments, adequately plead scienter.

## II. Plaintiffs Adequately Alleged Scienter Concerning Defendants' False and Misleading Statements About Amazon's Capacity Expansion

The District Court's scienter holding regarding the capacity-related statements is belied by common sense and any fair reading of the SAC. Defendants do not address the District Court's central error: "confus[ing] the question of whether an allegation is *independently sufficient* to establish scienter with … whether it is *relevant* as part of a holistic scienter analysis." *Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017). Assessed holistically, Plaintiffs' scienter allegations are as "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &*

---

that are probative of scienter [when] *viewed with a practical and common-sense perspective*" (emphasis added)).

*Rights, Ltd.*, 551 U.S. 308, 324 (2007). Moreover, "proof of scienter … is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

### A. Defendants' "Warnings" Do Not Negate Scienter

Defendants contend that any inference of scienter is negated because they stated Amazon "plann[ed] to build to the 'high side' and would 'overbuild to protect the customer experience'" and then clarified in July 2021 "that demand had 'mitigated' and that Amazon was 'no longer capacity constrained for physical space in the network.'" Opp'n.39 (quoting 3-ER-233, 3-ER-239, 3-ER-326). But this misrepresents the challenged statements (which the District Court found false and misleading and which Defendants do not challenge on appeal).

Jassy noted the decision to "build to the high side" in May 2022, *after* Amazon reported its $3.8 billion net loss (3-ER-239(¶265)), while Olsavsky's statement generalized that Amazon "*may* have to overbuild" to address increased demand (3-ER-233(¶249) (emphasis added)). Rather than disclose the material slowing of demand, during the July 2021 earnings call, Olsavsky mentioned fulfillment centers running at peak for over a year and stated, "It's starting to mitigate a bit but it's a strong undercurrent." 1-SER-53. The statement is not a "detailed risk disclosure," but a false assurance that, even if growth was slowing, demand remained strong. Olsavsky further explained that Amazon was "still catching up with [demand] from

last year" as it continued to add to the fulfillment network, with "most of that development … in the second half of the year" (3-ER-241(¶270)), but omitted that Amazon had already begun reducing its aggressive expansion. Defendants' attempt to decontextualize their statements and repurpose them as warnings designed to keep investors informed should be rejected.[9]

### B. Defendants' Specific, Repeated Statements Support Scienter

Plaintiffs' opening brief addressed numerous errors in the District Court's Order regarding Jassy's and Olsavksy's specific, repeated statements concerning Amazon's continued growth and need for fulfillment expansion. Pls.Br.40-44. In response, Defendants contend that scienter cannot be inferred from these statements because they are "limited and generalized." Opp'n.41. This conflicts with their argument (addressed above) that the statements Amazon would "build to the 'high side'"; "overbuild to protect the customer experience"; and was "no longer capacity constrained" negated scienter because they were "detailed … disclosures." Opp'n.39. Defendants cannot have it both ways.

Notwithstanding, Defendants ignore the pointed nature of the statements, including one made on October 28, 2021, when Jassy announced that Amazon had

---

[9]     *In re Worlds of Wonder Securities Litigation* is distinguishable because the Court concluded the statements revealed *actual adverse information* (including anticipated lower net sales) that negated scienter. 35 F.3d 1407, 1419, 1425 (9th Cir. 1994).

"driven extraordinary investments across our businesses to satisfy customer needs" and that it had "nearly doubled the size of our fulfillment network since the pandemic began." 3-ER-241(¶272). That same day, Olsavsky stated that Amazon had "nearly doubled our operations capacity in the past two years to keep up with customer demand" and assured the market that Amazon's investments in infrastructure were "long-term trends." 3-ER-241-42(¶¶273-74). Olsavsky further noted that "we continue to see an increase in customer demand and sales during the remainder of 2021" and Amazon had "invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years [and] expand[ed] our fulfillment center footprint." 3-ER-333(¶561).

The specific nature of these and similar statements "confirm[ed] [Defendants] had intimate knowledge" of Amazon's capacity expansion plans and shows "that is what they wanted the public, particularly investors, to think"—that they "were speaking as authoritative sources who possessed the information to support their statements." *SEB Inv. Mgmt. AB v. Endo Int'l, plc*, 351 F.Supp.3d 874, 906 (E.D. Pa. 2018); *see also Shenwick v. Twitter, Inc.*, 282 F.Supp.3d 1115, 1147 (N.D. Cal. 2017) ("[A]n assertion that Defendants were unaware of an alleged issue can be 'directly contradicted by the fact that [they] specifically addressed it in [their]

statement[s]." (alterations in original)).[10] Indeed, the level of specificity with which they spoke "'is strong circumstantial evidence that [they] were receiving some form of specific information' regarding the [capacity] issue." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F.Supp.3d 482, 522 (E.D.N.Y. 2025); *see also Reese*, 747 F.3d at 577 (finding "very specific representations" to investors supported scienter). It strains credulity to suggest that Jassy and Olsavsky possessed intimate knowledge of Amazon's aggressive fulfillment center expansion plans but then were somehow wholly unaware of its subsequent decision to pull back.

The only alternative inference, which the District Court overlooked, is that Jassy and Olsavsky spoke about Amazon's fulfillment capacity without specific knowledge of the subject, which would have been actionably reckless. *See Carvana*, 759 F.Supp.3d at 974 (reassurances "*without* actual knowledge" constitute "deliberate recklessness").

Moreover, Jassy's and Olsavsky's statements regarding Amazon's continued growth to meet demand stood in direct contrast to the fact that, no later than July 2021, Amazon's capacity exceeded demand and a series of cutbacks to its fulfillment

---

[10] Many of Defendants' public statements were in response to analysts' questions. *See, e.g.*, 3-ER-351-52(¶617); *see also Avaya*, 564 F.3d at 269-71 (finding "content and context of [defendant]'s statements themselves" to be "the most powerful evidence of scienter" when defendants' answers to analysts' questions were geared to maintain the "Avaya story" of growing operating margins).

capacity was necessary.  3-ER-244-45(¶285), 3-ER-350(¶613).  Such incongruity between word and deed can establish a strong inference of scienter.  *See In re QuantumScape Sec. Class Action Litig.*, 580 F.Supp.3d 714, 741 (N.D. Cal. 2022) (scienter pled when "individual defendants personally reported facts about the company that are alleged to be completely at odds with reality").

### C.    The Former Employee Accounts Support Scienter

Plaintiffs allege through former employee accounts that Jassy, Olsavsky, and Bezos were personally involved in decisions concerning Amazon's capacity. Defendants argue that these former employee accounts fail to support scienter because they did not report to or communicate with Jassy or Olsavsky.  Opp'n.37. But this is irrelevant.  "The notion that the [FE]s cannot be believed because none had direct contact with any individual Defendant is contrary to law."  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019); *accord Carvana*, 759 F.Supp.3d at 976 ("direct contact is not required").  At the pleading stage, a plaintiff need only identify the employees "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).[11]

---

[11]    Former employees need not provide "'smoking gun evidence' that establishes a clear intent to deceive."  *In re New Century*, 588 F.Supp.2d 1206, 1230 (C.D. Cal. 2008).

A former employee "does not need to be a fly on every relevant wall—or directly deliver every relevant presentation—to plead allegations supporting an inference of scienter." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023). Rather, testimony such as that here should be credited when it "provide[s] critical background information about the company's operations." *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012). FE-3 provided "critical background information" within her "sphere of knowledge" by drafting various documents regarding the fulfillment network that she personally knew were presented to senior executives, including Bezos and Olsavsky. 3-ER-248-50(¶¶302-07); *see also Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *23 (D.N.J. July 27, 2018) (crediting allegations of FEs who "spoke to issues within their sphere of knowledge" despite no direct communication with defendants).

### D. Temporal Proximity Supports Scienter

Defendants concede that temporal proximity may support scienter when coupled with additional allegations. Opp'n.42. Here, just two weeks before Amazon publicly announced a $3.8 billion loss, Jassy proclaimed that the Company "had to double [capacity] in the last 24 months to meet customer demand." 3-ER-244(¶282). This short period between Jassy's public statement and the revelation of contradictory information contributes to the holistic scienter analysis. *See Retail*

*Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F.Supp.3d 763, 777-78 (N.D. Cal. 2025) (temporal proximity probative of scienter when considered with other specific allegations).

### E. Jassy's Management Style Supports Scienter

Defendants acknowledge that a "hands-on" management style may "establish an inference of scienter" when paired with additional "particularized facts reflecting intentional or deliberately reckless conduct." Opp'n.42. Plaintiffs have done that by alleging the "specific information conveyed to management and related to the fraud," *id.* (citation omitted), including the June 2022 *Wall Street Journal* report, which clarified Jassy's actual knowledge of the expansion issues from the time he became CEO, 3-ER-318(¶519) ("By July 2021, it became clear to Mr. Jassy and Amazon's logistics team that Amazon's capacity was outpacing demand."). The *Journal* also noted Jassy's direct involvement with the logistics team as Amazon made "intensifying cutbacks to the plans for capacity growth" throughout the second half of 2021. *Id.*; *see also In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *7 (W.D. Pa. May 18, 2023) ("[A]rticles 'published in ... reputable newspapers' … 'meet the requirements of being independent and reliable.'"). Jassy's "significant involvement" in the cutbacks "bolsters the inference that [he] would have been aware" of the issues with the aggressive expansion. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F.Supp.3d 164, 244 (S.D.N.Y. 2022); *see also Garbaccio v.*

*Starbucks Corp.*, 2025 WL 3228275, at *22 (W.D. Wash. Nov. 19, 2025) (finding scienter against executive who "was partially responsible for overseeing and monitoring the progress of the … plans" in question).

Jassy and Olsavsky also received reports from Amazon's Financial Planning and Analysis Team about cutbacks to fulfillment capacity and the halt on capital expenditures. 3-ER-238-39(¶264). Through Amazon's forecasting system, they received "projections for product demand and the growth in logistics needed"— which necessarily included reporting when and by how much that growth exceeded demand. 3-ER-239-40(¶¶265-66). By late 2020, internal projections showed that demand was not at the level to which Amazon had sourced increased incremental fulfillment capacity. 3-ER-246(¶291). Having "specifically alleged [D]efendants' knowledge of facts or access to information contradicting [Defendants'] public statements[]," Plaintiffs have alleged a "'strong inference' of scienter." *Levon v. CorMedix Inc.*, 2025 WL 2400346, at *23 (D.N.J. Aug. 19, 2025) (alterations in original); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (allegation defendants had "actual access to the disputed information" supported scienter).

### F.     The Core Operations Doctrine Supports Scienter

The capacity expansion plan, involving up to *$50 billion* in expenditures (3-ER-249(¶305), was central to Amazon's operations.[12]   Unsurprisingly, the importance of the expansion to Amazon's e-commerce growth and the magnitude of the investment were frequently discussed by Defendants and analysts.  3-ER-235-39(¶¶256-64), 3-ER-240-44(¶¶268-82), 3-ER-348-49(¶¶607-09).[13]   Coupled with the particularized allegations that "suggest that defendants had actual access to the disputed information," *Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *2 (9th Cir. Dec. 20, 2024), scienter may be directly inferred under the core operations "actual access" test, *see* Pls.Br.54.

The absurdity test also applies.  Defendants contrast the project's cost with Amazon's overall revenue (Opp'n.44-45), arguing the expense was minimal comparatively and thus not necessarily known to management.  But that framing

---

[12]     Defendants erroneously suggest that the core operations doctrine applies only in "exceedingly rare" cases.  Opp'n.44.  That qualification referred to cases where "the core operations inference, without more, is sufficient under the PSLRA." *Killinger*, 542 F.3d at 785 n.3.  The doctrine may be invoked with allegations of actual access and as a part of the holistic review without that admonition.

[13]     Defendants' statements directly contradicted the suggestion that the capacity investment was relatively insignificant.  Olsavsky stated Amazon had "invested significantly" to expand capacity (3-ER-243(¶278)), and Jassy spoke of the "extraordinary investments" Amazon made in capacity and workforce growth (3-ER-325(¶541)).  The natural inference is that the CFO and CEO stayed apprised of those developments, but if they did not, they were deliberately reckless in making the misleading statements.

sidesteps the substance of the inquiry: "whether, given the importance of the information, it would be 'absurd' to suggest that management was without knowledge of the matter." *In re Origin Materials, Inc. Sec. Litig.*, 766 F.Supp.3d 998, 1011 (E.D. Cal. 2025) (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021)). The expansion plan was "critical to [the] business's 'core operations'" (e-commerce), raising a strong inference that Defendants knew about the issues. *Sneed*, 147 F.4th at 1134; *see also zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *22 (S.D.N.Y. July 25, 2025) ("[T]he AC alleges that rapid portfolio expansion was central to LuxUrban's business model. That undermines any inference that top executives … were unaware.").

### G.    A Holistic Review Supports Scienter

This Court has cautioned about "potential pitfalls that may arise from conducting a dual analysis" of the scienter allegations and the "risk … a piecemeal analysis will obscure a holistic review." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012). The District Court paid lip service to this requirement, and Defendants repeat the error. Considered holistically (and with common sense), Plaintiffs' scienter allegations provide a compelling narrative that Defendants knew—or were deliberately reckless in not knowing—that their statements regarding the capacity expansion plan were false and misleading and were directly contradicted by contemporaneous decisions to pare back the

expansion. Protestations of good faith are of no consequence on a Rule 12(b)(6) motion, particularly when, as here, they lack support in a complaint. *See* Pls.Br.65.

## III. Defendants Failed To Rebut Plaintiffs' Showing Of Motive

Plaintiffs' allegations are sufficient to support a strong inference of scienter even absent motive allegations. *See, e.g.*, *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 970-71 (9th Cir. 2014) (scienter adequately pled and noting lack of motive allegation "not fatal"); *In re Fastly, Inc. Sec. Litig.*, 2025 WL 2721693, at *21 (N.D. Cal. Sept. 24, 2025) ("compelling and particularized facts" of scienter sufficient). Indeed, since 2021, this Court has found scienter sufficiently pled without motive at least five times. *See, e.g.*, *Sylebra Cap. Partners Master Fund Ltd. v. Everbridge, Inc.*, 2025 WL 1938359, at *1 (9th Cir. July 15, 2025) (inferring motive when former employees alleged defendants had access to relevant information); *see also* Pls.Br.56 (summarizing cases).

Nevertheless, this Court has confirmed that "motive is *helpful* in establishing scienter," *Petrie*, 761 F.3d at 970 (emphasis added), and Plaintiffs adequately allege two financial motivations. *First*, Amazon's unusual stock-based compensation structure incentivized executives to retain their positions and inflate Amazon's share price over any quarter, resulting in stock options representing *dozens* of times their base salaries (which they would lose upon separation from Amazon) to vest. Pls.Br.57-61. *Second*, multiple Individual Defendants engaged in suspiciously

timed stock sales, at levels far greater than their pre-Class Period sales, to profit from Amazon's inflated share price. *Id.* at 61-63.

### A.    The Compensation Allegations Support Scienter

Defendants characterize Amazon's compensation plan as "generic" and imply that such plans are "common." Opp'n.2, 31. This contradicts Amazon's own proxy statements, which touted the Company's unique compensation plan whereby "[b]ase salaries ... are designed to provide a minimum level of cash compensation and to ***be significantly less than those paid to senior leadership at similarly situated companies***." 3-ER-354(¶623). In lieu of large base salaries, Individual Defendants Jassy, Olsavsky, and Clark received vested stock options each year that ranged from *5,000% to 285,000%* of their base. Pls.Br.58.

When, as here, "executives' compensation from stock and cash awards *far outstripped their base salaries*," courts have found the "strong correlation between financial results and stock options or cash bonuses for individual defendants" supported a finding of scienter. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F.Supp.3d 580, 603 (N.D. Cal. 2019); *see also Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2025 WL 2426714, at *7 (C.D. Cal. Aug. 20, 2025) (scienter strengthened when stock and options compensation far exceeded salary-based compensation); *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 145 (2d Cir. 2025) ("[Courts] may infer the defendants' 'motive to sweep problems under the

rug' if the allegations support a 'direct link between the compensation package and the fraudulent statements.'" (citation omitted)).

The magnitude of the difference between base and incentive compensation distinguishes this case from *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, on which Defendants rely (Opp'n.31), where the defendants' compensation was "based partly" on incentive compensation. 697 F.3d 869, 884 (9th Cir. 2012).[14] By contrast, Olsavsky, Clark, and Jassy received incentive compensation between *2,000%-61,000%* of their annual salary *each quarter*. 3-ER-358-59(¶634).

Moreover, Plaintiffs allege a direct "correlation" between the alleged false statements and the Individual Defendants' compensation. Opp'n.31-32, 48.[15] Amazon's stock grants were specifically tied to executives' contributions to

---

[14]    The lower court's opinion in *Rigel* confirms that the incentive compensation was not on the scale at issue here, finding that the "five Individual Defendants only received less than $2.3 million in increased compensation and bonuses in 2008." *In re Rigel Pharms., Inc. Sec. Litig.*, 2010 WL 8816155, at *13 (N.D. Cal. Aug. 14, 2010).

[15]    Defendants assert that Plaintiffs must "plead with 'particularity' facts 'indicating how intimately' specific compensation incentives were 'tied to the company's financials' that were allegedly misstated." Opp'n.32 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009)). This overstates *Zucco*. That case concerned misstated financials, so plaintiffs needed to connect defendants' motive to the company's financial statements. *See* 552 F.3d at 988, 1004. Here, Defendants' false statements concealed weaknesses in Amazon's overall performance, and the Court's focus should be on whether Defendants had a motive to misrepresent that performance with regard to the capacity expansion and third-party seller allegations.

Amazon's performance, with Olsavsky's compensation tied to his ability to manage its "credit facilities and liquidity to finance [Amazon's] operations and *continue its expansion*," and to maintain strong internal controls "as the scope of ***our operations grew***"; and Jassy's grant upon promotion to CEO linked to his "past performance ***and critical role in leading the Company forward***." 3-ER-357(¶630). The awards' rationale would collapse if Defendants disclosed that Amazon's fulfillment capacity had outstripped demand and that its success was driven in part by illegal anti-competitive practices. 3-ER-357(¶631). Defendants were not only motivated to receive these tremendous grants, but to remain employed as long as possible and avoid forfeiting millions in unvested equity. 3-ER-355-56(¶¶626-27).

Defendants also misconstrue the relevance of Clark's forced resignation. Opp'n.32-33. While Clark may have "resigned … after both purported frauds were allegedly revealed" (*id.*), the fact that he was forced out, losing $100 million in unvested stock options (3-ER-360(¶636)) following the corrective revelations, supports Plaintiffs' contention that the Individual Defendants faced a substantial threat of losing their unvested compensation. Clark's departure illustrates why Defendants were motivated to conceal adverse performance information. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F.Supp.3d 300, 318 (S.D.N.Y. 2024) (motive allegations supported scienter when corporation's

25

board "reduced cash and stock bonuses" as "issues began to emerge"). What happened indicates what Defendants believed *could* happen.

### B. Defendants' Suspicious Stock Sales Support A Scienter Finding

While stock sale-related allegations are "not needed" to plead scienter, *Alphabet*, 1 F.4th at 707, this Court has clarified that "[u]nusual trading *or* trading at suspicious times *or* in suspicious amounts by corporate insiders has long been recognized as probative of scienter," *Daou*, 411 F.3d at 1022 (emphases added).[16]

Jassy, Wilke, Olsavsky, and Clark collectively sold over $315 million in stock during the Class Period at levels and for proceeds far higher than during the equally long control period, with three of them making millions in stock sales shortly after alleged false statements and only two months before Plaintiffs allege the truth was revealed. Pls.Br.62-63.[17] These sales *were* suspiciously timed. Moreover, Defendants' assertion that Plaintiffs only provided the shares' "absolute value" (Opp'n.34) is incorrect, as Plaintiffs alleged the exact amount of shares sold and

---

[16] As Plaintiffs explained previously, this test is disjunctive and satisfying *any* of the factors can strengthen an inference of scienter. Pls.Br.61-62 & n.17. While Defendants dispute this characterization (Opp'n.36), they cite no authority holding that the test is conjunctive, or explain how *Daou* was overturned without a decision to that effect "by the [Ninth Circuit] … itself sitting en banc, or by the Supreme Court." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).

[17] Contrary to Defendants' argument (Opp'n.34-35), Plaintiffs have *not* abandoned their allegations that Jassy's November 2021 sales were suspiciously timed. Plaintiffs did argue that "the sales … were suspiciously timed," and provided February 2022 as an "example." Pls.Br.62-63.

"analyzed the trading by the individual Defendants during the Class Period and during the equal-length period immediately preceding the Class Period." *In re Intuitive Surgical Sec. Litig.*, 65 F.Supp.3d 821, 839 n.4 (N.D. Cal. 2014). These suspiciously timed stock sales provide "circumstantial evidence of scienter." *Quality Sys.*, 865 F.3d at 1146.

Defendants' argument that the capacity and third-party seller allegations should be considered separately for comparing Class Period and control period sales (Opp'n.33-35) is nonsensical. Defendants offer no support for it, and courts routinely examine stock sales across an entire class period, even if there are multiple categories of misstatements. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F.Supp.3d 999, 1013, 1029-30 (N.D. Cal. 2020) (identifying three categories of false or misleading statements, but analyzing stock sales across entire class period). Otherwise, stock sales made *during* an ongoing fraud would count *against* Defendants' scienter. This Court should reject that absurd result.

Defendants further assert that the sales by Jassy, Olsavsky, and Clark should not be considered when evaluating scienter for the capacity allegations because Clark is not alleged to have made any of the alleged false statements and Jassy and Olsavsky only sold a small portion of their holdings. Opp'n.34-35. But this Court has considered sales by *non-defendant* executives to support scienter, much less defendants not alleged to have made the challenged statements. *See Daou*, 411 F.3d

27

at 1024 (that "other Daou executives as well as defendants' family members" sold stock during class period supported scienter). And a defendant's stock sale of "only 2.1% of his holdings ... support[s] a strong inference of scienter" when those sales were otherwise suspicious and other indicia of scienter existed. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). Finally, all Individual Defendants were control persons of the Company throughout their tenures during the Class Period and thus have potential liability. 3-ER-387(¶734).

Defendants also argue that stock sales cannot be used to support scienter because certain Individual Defendants *increased* their holdings during the Class Period. Opp'n.34, 49-50. But an increase does not undercut scienter when it does not originate from open-market purchases. *See, e.g.*, *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022) (noting defendants "received shares as part of a compensation or incentive package" but rejecting argument "any inference of scienter is undermined" "because [defendants] increased their positions … during the class period"). Moreover, courts have found increases in stock holdings are of no moment when, as here, other factors support an inference of scienter. *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *11 (W.D. Wash. Dec. 29, 2008) ("[T]hat neither [defendant] sold any stock during the Class Period but instead continued to purchase [company] stock … is not sufficient to overcome

28

the strong inference of scienter created by the [other] allegations."). An insider's class period stock purchases may also contribute to scienter if it appears they were made in an attempt "to negate any possible inference of fraud." *Holmes v. Baker*, 166 F.Supp.2d 1362, 1378 (S.D. Fla. 2001). Nor must Defendants have sold stock at the "peak" of Amazon's stock price to support scienter. *See Daou*, 411 F.3d at 1024 (while finding "defendants did not capitalize on Daou's peak price per share," allegations of sales "made at suspicious moments" supported inference of scienter).

Finally, Defendants assert Wilke's and Clark's Class Period sales were not suspicious, but those contentions are unavailing. Wilke's Class Period sales exceeded the value of his control period sales by over *$30 million*. 3-ER-362(¶642). Defendants' attempt to recharacterize Plaintiffs' allegations that Clark did not report any control period sales into an admission that sales *may* have occurred but were not reported (Opp'n.50) is inappropriate at the pleadings stage. *See Johnson v. Knapp*, 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts.").

## IV. Defendants' Loss Causation Challenge Should Be Rejected

Relying principally on *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), Defendants argue that "the announcement of an investigation, standing alone," is insufficient to establish loss causation. Opp'n.64. But the announcement of a government investigation is "sufficient when 'viewed together with the totality of

the other alleged partial disclosures.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (announcement of investigation is corrective disclosure when "more is alleged"). Defendants ignore that *Loos* was subsequently limited by *Lloyd*.

Here, unlike *Loos*, where loss causation was based solely on a government investigation, the *Journal*'s announcement in April 2022 that the SEC was investigating how Amazon conducted its business practices (3-ER-258(¶327), 3-ER-381(¶714)) was part of several interconnected partial disclosures, including (1) the release of the Subcommittee's final report in October 2020 (3-ER-381(¶712)), which revealed substantial evidence of wrongdoing, including that Amazon misappropriated third-party seller data for its own benefit (3-ER-161-70(¶¶70-88)); and (2) a lawmaker's request that the DOJ investigate Amazon for potential criminal conduct (3-ER-378(¶704)). The announcement of the SEC investigation must also be considered in light of subsequent events,[18] including media reports that Amazon offered significant concessions to settle a European Commission investigation into how Amazon unfairly used third-party seller data to benefit its retail business (3-ER-173(¶97), 3-ER-186(¶130)) (concessions suggesting that, consistent with the April 2022 disclosure, Amazon misused third-party seller information), and discussed

---

[18]     "[N]o stock price drop need accompany" the announcement(s) of any such subsequent events. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017).

internally "making a more drastic move to ward off regulators: abandoning its private-label business altogether" (3-ER-382(¶¶716-17)). Thus, the requisite something "more" is present and loss causation is adequately pled.[19]

### CONCLUSION

Plaintiffs respectfully request that this Court reverse the District Court's Judgment and reject Defendants' loss causation analysis.

Dated: November 25, 2025

           **MOTLEY RICE LLC**

           */s/ Gregg S. Levin*
           Gregg S. Levin
           glevin@motleyrice.com
           William S. Norton
           bnorton@motleyrice.com
           Christopher F. Moriarty
           cmoriarty@motleyrice.com
           Susan Ranee Saunders
           rsaunders@motleyrice.com
           Erin C. Williams
           ecwilliams@motleyrice.com
           28 Bridgeside Blvd.
           Mt. Pleasant, SC 29464
           Telephone: (843) 216-9000

           *Co-Lead Counsel for Lead Plaintiffs*
           *and the Class*

---

[19] It is irrelevant whether the "more" required by *Lloyd* precedes or follows the investigation announcement. *See McKesson*, 411 F.Supp.3d at 604-05 ("[I]t would be a mistake to read *Lloyd* to require that an investigation be announced before any other relevant disclosures. That is just one of an 'infinite variety' of theories that adequately allege loss causation.").

**POMERANTZ LLP**
Jeremy A. Lieberman
jalieberman@pomlaw.com
Emma Gilmore
egilmore@pomlaw.com
Villi Shteyn
vshteyn@pomlaw.com
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
James A. Harrod
jim.harrod@blbglaw.com
Timothy G. Fleming
timothy.fleming@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400

*Additional Counsel, and Counsel for
Asbestos Workers Philadelphia Welfare
and Pension Fund*

**TOWNSEND LEGAL, PLLC**
Roger M. Townsend (WSBA #25525)
roger@townsendlegal.com
380 Winslow Way, Suite 200
Bainbridge Island, WA 98110
Telephone: (206) 761-2480

*Local Counsel in Western District of
Washington*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-2505

I am the attorney or self-represented party.

**This brief contains** | 6,958 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/Gregg S. Levin | **Date** | November 25, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 25, 2025

MOTLEY RICE LLC

/s/ *Gregg S. Levin*
GREGG S. LEVIN